## UNITED STATES DISTRICT COURT
## DISTRICT OF THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA<br>*ex rel.* CARL R. ECKERT,<br><br>       Plaintiff,<br><br>     v.<br><br>SCI TECHNOLOGY, INC. and<br>SANMINA CORPORATION,<br><br>       Defendants. | Case No. 20-cv-1443-ACR |

## <u>DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS</u>

**Table of Contents**

**Page**

I.  ARGUMENT .................................................................................................... 1

   A.  Relator's Reliance on *Heath* is Misplaced ....................................... 1

   B.  Relator's Cost and Pricing Claims Under CAS and TINA Should Be Dismissed .......... 4

    1. Relator Does Not Allege Any Plausible Claim for Violation of CAS ............................. 4

    2. Relator Does Not Allege Any Plausible Claim for Violation of TINA ........................... 7

    3. The Cost and Pricing Claims Are Not Alleged with Particularity ................................... 11

   C.  Relator's Commercial Items Claims (Counts 9 and 14) Should Be Dismissed ............ 13

   D.  Relator's DCU Product Substitution Claim (Count 13) Should Be Dismissed ............ 17

   E.  Relator's GSA Fraudulent Inducement Claims (Counts 10 and 11) Should Be Dismissed .................................................................................................... 18

   F.  Relator's SCA Claims (Counts 12, 15, and 16) Should Be Dismissed ......................... 20

   G.  Relator Has Not Plausibly Alleged Materiality ................................................ 22

   H.  Relator Has Not Plausibly Alleged Scienter ................................................... 23

   I.  Sanmina Should Be Dismissed ........................................................................ 24

II. CONCLUSION ............................................................................................... 25

# Table of Authorities

Page(s)

## <u>Cases</u>

*Allegheny Teledyne Inc. v. United States*,
  316 F.3d 1366 (Fed. Cir. 2003) ................................................................ 6

\*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ................................................................ 4, 18

*Danielsen v. Dole*,
  746 F. Supp. 160 (D.D.C. 1990) ................................................................ 21

*Diamond Chem. Co. v. Atofina Chems., Inc.*,
  268 F. Supp. 2d 1 (D.D.C. 2003) ................................................................ 25

*Labadie Coal Co. v. Black*,
  672 F.2d 92 (D.C. Cir. 1982) ................................................................ 24

*Pencheng Si v. Laogai Rsch. Found.*,
  71 F. Supp. 3d 73 (D.D.C. 2014) ................................................................ 12, 14, 16

*Sikorsky Aircraft Corp. v. United States*,
  105 Fed. Cl. 657 (2012) ................................................................ 6

*United States ex rel. Adams v. Dell Comput. Corp.*,
  No. 15-CV-608 (TFH), 2022 WL 20765235 (D.D.C. Mar. 29, 2022) .................................... 23

*United States ex rel. Barko v. Halliburton Co.*,
  241 F. Supp. 3d 37 (D.D.C. 2017) ................................................................ 20

*United States ex rel. Campbell v. Lockheed Martin Corp.*,
  282 F. Supp. 2d 1324 (M.D. Fla. 2003) ................................................................ 8

\*United States ex rel. Cimino v. Int'l Bus. Machs. Corp.*,
  3 F.4th 412 (D.C. Cir. 2021). ................................................................ 11, 12 17, 19

\*United States ex rel. Conteh v. IKON Off. Sols., Inc.*,
  27 F. Supp. 3d 80 (D.D.C. 2014) ................................................................ 12, 23

*United States ex rel. Graves v. ITT Educ. Servs., Inc.*,
  284 F. Supp. 2d 487 (S.D. Tex. 2003) ................................................................ 21

\*United States ex rel. Heath v. AT&T, Inc.*,
  791 F.3d 112 (D.C. Cir. 2015) ................................................................ 1, 2, 12

*United States ex rel. Hockett v. Columbia/HCA Healthcare Corp.*,
   498 F. Supp. 2d 25 (D.D.C. 2007) ................................................................... 7, 24, 25

*United States ex rel. Kasowitz Benson Torres LLP v. BASF Corp.*,
   285 F. Supp. 3d 44 (D.D.C. 2017) ............................................................................ 22

*United States ex rel. McLamore v. Winn Cos.*,
   No. 16-CV-1274 (TSC), 2022 WL 18024623 (D.D.C. Dec. 30, 2022) .................................... 23

*United States ex rel. Morsell v. NortonLifeLock, Inc.*,
   651 F. Supp. 3d 95 (D.D.C. 2023) ............................................................................ 18

*United States ex rel. PCA Integrity Assocs., LLP v. NCO Fin. Sys., Inc.*,
   No. 15-750, 2020 WL 686009 (D.D.C. Feb. 11, 2020) ............................................................ 22

*United States ex rel. Scott v. Pac. Architects & Eng'rs*, Inc.,
   No. CV 13-1844 (CKK), 2020 WL 224504 (D.D.C. Jan. 15, 2020) ........................................ 23

*United States ex rel. Williams v. Martin-Baker Aircraft Co., Ltd.*,
   389 F.3d 1251 (D.C. Cir. 2004) ................................................................... 8, 12, 13, 14

*United States v. Comstor Corp.*,
   308 F. Supp. 3d 56 (D.D.C. 2018) ................................................................... 15, 24

*United States v. Lozano*,
   No. CV 17-2433 (RJL), 2023 WL 6065162 (D.D.C. Sept. 18, 2023) ........................................ 3

*United States v. Sci. Applications Int'l Corp.*,
   626 F.3d 1257 (D.C. Cir. 2010) ................................................................................ 23

*United States v. United Techs. Corp., Sikorsky Aircraft Div.*,
   51 F. Supp. 2d 167 (D. Conn. 1999) ........................................................................... 8

*United States v. Universal Health Servs., Inc.*,
   No. 1:07CV00054, 2010 WL 4323082 (W.D. Va. Oct. 31, 2010) ........................................... 25

*Universal Health Servs., Inc. v. United States ex rel. Escobar*,
   579 U.S. 176 (2016) ................................................................................... 22, 23

*Wynne v. United Techs. Corp.*,
   463 F.3d 1261 (Fed. Cir. 2006) ................................................................................ 8

## <u>Statutes</u>

31 U.S.C. § 3729(a)(1) ........................................................................................ 14, 15

41 U.S.C. § 3501(a)(1) ............................................................................................... 8

41 U.S.C. § 6705(b)(1) ............................................................................................ 21

## <u>Rules</u>

Fed. R. Civ. P. 8 ............................................................................................... *passim*

Fed. R. Civ. P. 9 ............................................................................................... *passim*

Fed. R. Civ. P. 12 .............................................................................................. 16, 23

## <u>Regulations</u>

29 C.F.R. § 4.6 ........................................................................................................ 21

48 C.F.R. § 2.101 ......................................................................................... 10, 13, 14

48 C.F.R. § 6.303-2 ................................................................................................ 17

48 C.F.R. § 8.404(d) .......................................................................................... 18, 19

48 CFR § 9904.401-20 ............................................................................................. 6

48 C.F.R. § 9904.401-40(a) ...................................................................................... 4

48 C.F.R. § 9904.411-50(b) ..................................................................................... 9

DFARS § 212.102 ................................................................................................... 15

## <u>Other Authorities</u>

*Appeal of E-Sys., Inc.*,
   ASBCA No. 17557, 74-2 B.C.A. ¶ 10782  (Aug. 7, 1974) ...................................... 11

*\*Appeal of Hughes Aircraft Co.*,
   ASBCA No. 30144, 90-2 BCA ¶ 22847  (Mar. 26, 1990) ....................................... 8

Defense Contract Management Agency's, *Commercial Item Group
   Frequently Asked Questions*, Answer to Question #7 (May 30, 2024) ..................... 14

Dep't. of Defense, Guidebook for Acquiring Commercial Items, *Part A: Commercial Item Determination* (2018, rev. 2019) ............................................................................................. 14

*In re Texas Instruments*,
ASBCA No. 18621, 79-1 B.C.A. ¶ 13800  (Mar. 30, 1979)....................................................... 5

*Appeal of Texas Instruments, Inc.*,
ASBCA No. 18621, 79-2 B.C.A. ¶ 14184  (Nov. 20 1979)........................................................ 5

Relator's Memorandum of Points and Authorities in Support of Opposition to Defendants' Motion to Dismiss (the "Opposition") underscores his fundamental misunderstanding of key government contracting concepts. Consequently, the Opposition does not squarely address his failure to plead falsity under the False Claims Act ("FCA"). At the same time, Relator does not adequately address the pleading deficiencies in the Amended Complaint regarding scienter, materiality, and—for the counts alleging fraudulent inducement—but-for causation. In an attempt to overcome the failure to plead the particulars required under Rule 9(b) of the Federal Rules of Civil Procedure, Relator now attempts to repackage all of his allegations as a single scheme of "institutionalized" corporate fraud. But he does not and cannot connect his disparate fraud theories into a single coherent "scheme." Relator's Complaint fails to state a claim for relief under the FCA and should be dismissed.

## I.    ARGUMENT

### A.  Relator's Reliance on *Heath* is Misplaced

Relying upon *United States ex rel. Heath v. AT&T, Inc.*, 791 F.3d 112 (D.C. Cir. 2015), Relator tries to evade Rule 9(b) pleading requirements by re-framing his Complaint as one alleging an institutionalized corporate scheme to defraud. But the Complaint does not plead a cohesive scheme: it contains sixteen counts under four different subsections of the FCA; relies upon several vastly different statutory and regulatory frameworks; invokes multiple theories of falsity and fraud under the FCA; and alleges over a dozen disconnected events spanning a nine-year period of time. Relator cannot unify these conceptually distinct theories of fraud into one organizational scheme, and, accordingly, his attempt to apply what he describes as *Heath*'s "flexible and context-specific" precepts fails. *See* Opp'n 7 (citing *Heath,* 791 F.3d at 125).

*Heath* is distinguishable. In *Heath*, the relator alleged that the defendant telecommunications company engaged in an institutionalized scheme to overcharge the FCC's

Universal Service Fund from 1997 to 2009.  791 F.3d at 117, 125.  The court found that the complaint alleged "with specificity how the company itself institutionalized and enforced its fraudulent scheme . . . ."  *Id.* at 125.  As the court found:

> The complaint lays out in detail the nature of the fraudulent scheme, the specific governmental program at issue, the specific forms on which misrepresentations were submitted or implicitly conveyed, the particular falsity in the submission's content, its materiality, the means by which the company concealed the fraud, and the timeframe in which the false submissions occurred.

*Id.* at 115.  The court went on to explain that the fraudulent scheme included the deliberate omission of the relevant rate requirements from the defendant's "pricing and billing scheme," the decision not to train employees in compliance with those requirements (as indicated by their absence in training materials) despite a FCC consent decree requiring such training, and the existence of audit results detailing overcharging practices consistent with the complaint.  *Id.* at 124.  Against this backdrop of pervasive, institutional fraud, backed by specific factual allegations, the court held that relator had alleged with particularity the time period (1997 to 2009), the actor (the defendant corporation itself), and the nature of the fraud ("a centralized and institutionalized failure to comply with the lowest-corresponding-price requirement").  *Id.*

In contrast, Relator's novel framing of his allegations as a "fraudulent scheme" based on a "deliberate, institutionalized decision to use an inadequate accounting system," Opp'n 10, does not comport with what is alleged in the Complaint.  The Complaint does not allege a single, institutionalized scheme to defraud the United States.  Rather, it alleges multiple theories of false records and false claims from disconnected conduct involving different individuals, different government contracts and agencies, different underlying products, and different time frames.  Because no unifying scheme is alleged, there is no justification for relaxing the particularity requirements of Rule 9(b).

Even among the counts Defendants grouped together as the Cost and Pricing Claims, *see* MTD 7, Relator cannot explain how the counts relate to each other or fall under a common scheme. The Complaint does not describe an institutional scheme to perpetuate a deficient accounting system to profit from the government. *See United States v. Lozano*, No. CV 17-2433 (RJL), 2023 WL 6065162, at *5 (D.D.C. Sept. 18, 2023) (finding that the "what" requirement of 9(b) was not met when relator failed to "fully explain how the alleged scheme . . . is supposed to work" (citation omitted)). And the so-called Umbrella Project alleged in the Complaint reflects an effort on the part of SCI to improve its accounting system—not to institutionalize any alleged inadequacies in it. MTD 13, n.7. This is in sharp contrast from the conduct of the *Heath* defendant, which neglected to train its employees in defiance of an FCC consent decree.

The distinctions between Relator's counts are even more pronounced when considering those outside of the Cost and Pricing Claims category. Count 9 alleges that SCI misrepresented DCUs as commercial, fraudulently inducing the Coast Guard to award SCI a contract and causing the presentment of false claims, while Count 14 alleges that SCI falsely misrepresented TOCNET as a commercial item and fraudulently induced prime contractors or government agencies to purchase TOCNET at inflated prices. Compl. ¶¶ 289, 298, 402–44. Counts 12, 15, and 16 all concern the Service Contract Act ("SCA") and are each brought under separate provisions of the FCA proscribing fraudulent inducement, conversion of government funds, and "reverse" false claims. *Id.* ¶¶ 373, 410, 421. There is no throughline for these disjointed claims. Accordingly, *Heath* cannot save the Complaint from dismissal. Relator alleges no institutional scheme that justifies merely stating a broad span of time (2011–2020), Sanmina and SCI as the actors, or the absence of any particulars about any alleged false claim, record, or statement.

**B.  Relator's Cost and Pricing Claims Under CAS and TINA Should Be Dismissed**

There is no plausible allegation of falsity arising from what the Complaint describes as "[t]he CAS-TINA Certifications Fraud."  The Complaint alleges that SCI could not "(a) comply with CAS and with TINA; and (b) provide accurate, current, or complete cost data; or (c) provide truthful CAS and TINA certificates."  *Id.* ¶ 134.  But it fails to allege why SCI could not comply, or how SCI's CAS and TINA certificates were false.

Relator's TINA and CAS claims are both premised upon alleged cost accounting system inadequacies.  *See, e.g.*, *id.* ¶ 176 ("SCI knew that its cost accounting system *did not* meet the standards required by the CASB"); *id.* ¶ 183 ("[F]alse records . . . resulting from SCI's inadequate cost accounting system.").  As outlined in the MTD, the alleged accounting system inadequacies do not violate either CAS or TINA.  *See* MTD at 9–12.  The Complaint does not allege how SCI failed to make any disclosure required under TINA or how or why SCI falsely certified compliance with CAS or TINA.  Because Relator has failed to plausibly allege any such violation, which is a predicate to the allegations of false certification and false claims, the Complaint alleges nothing more than what the Supreme Court has condemned as "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements" to support Relator's claims.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

**1.  Relator Does Not Allege Any Plausible Claim for Violation of CAS**

Relator argues that SCI's accounting practices did not comply with CAS section 401, which requires that "[a] contractor's practices used in estimating costs in pricing a proposal shall be consistent with his cost accounting practices used in accumulating and reporting costs."  48 C.F.R. § 9904.401–40(a).  In the Complaint, Relator's principal contention is that SCI did not comply with CAS because "what SCI's cost accounting system did was to *aggregate* the costs for the production of *all* such items across *all* contracts and purchase orders that called for the

4

production of that item." Compl. ¶35 (a); *see also id*. ¶¶ 57, 69(b), 72. But, as explained in the MTD, CAS does not prohibit the accumulation and reporting of costs "using data from products or assemblies furnished under a number of contracts.". MTD 10–12; *In re Texas Instruments*, ASBCA No. 18621, 79-1 B.C.A. ¶ 13800 (Mar. 30, 1979), *aff'd*, *Appeal of Texas Instruments*, *Inc.*, ASBCA No. 18621, 79-2 B.C.A. ¶ 14184 (Nov. 20 1979)). Consequently, Relator's factual allegations regarding the accounting system inadequacies, even if proven, would not give rise to the presentation of a false or fraudulent claim in violation of the FCA.

Apparently conceding that the holding of *In re Texas Instruments* forecloses the theory alleged in the Complaint, Relator advances a new argument: that SCI was not consistent in how it "bid price proposals" versus how it made "internal profit calculations." Opp'n 19. Relator contends, for example, that "SCI was *using* its defective cost accounting system to provide contractual 'actuals' to prospective customers, while it was simultaneously using historical data to calculate profits: thus, it was inconsistent, violating CAS Standard 401." Opp'n 24. But Relator offers no explanation as to how "contractual 'actuals'" are different from "historical data," and he does not specify why SCI's use of "contractual actuals" to estimate costs in pricing a proposal is inconsistent with the cost accounting practices that SCI used in accumulating and reporting costs. *See* CAS § 401(a). The Complaint places great reliance on SCI's internal profit calculations, Compl. ¶¶ 71–98, alleging that "SCI calculated estimated profit margins for each of its contracts and purchase orders, doing so for its own internal accounting purposes." *Id.* ¶ 72. But the Complaint does not allege that these internal profit estimates were part of the "cost accounting practices used in accumulating and reporting costs" required by CAS 401, rather than merely informal projections used for budgeting, business incentives, or other purposes. The Complaint does not specify what SCI certified in any CAS disclosure statements (*see id*. ¶¶ 44–

47); what was inconsistent in its practices for estimating costs in pricing proposals versus its practices for accumulating and reporting costs; or any other details describing how SCI's accounting practices failed to comply with CAS.

In his Opposition, Relator now contends that SCI employed a "fraudulent 'two sets of books' accounting practice" that violates the requirements of CAS section 401. Opp'n 20. But there is no factual support in the Complaint for his contention that SCI kept "two sets of books" or engaged in fraudulent "double entry" accounting. *See id.*

Relator's argument only highlights his misunderstanding of the "consistency" required by CAS section 401. The CAS are "designed to achieve uniformity and constancy in the cost-accounting principles followed by defense contractors and subcontractors under [f]ederal contracts." *Sikorsky Aircraft Corp. v. United States*, 105 Fed. Cl. 657, 661 n.4 (2012) (quoting *Allegheny Teledyne Inc. v. United States*, 316 F.3d 1366, 1370 (Fed. Cir. 2003)). CAS 401 requires consistency in the practices used by a contractor for "*estimating* costs in pricing proposal[s]" on the one hand, and for "*accumulating and reporting* costs" on the other. *See* 48 CFR § 9904.401-20 (emphasis added). There are no factual allegations in the Complaint that SCI's practices when estimating costs for pricing proposals were inconsistent with the practices used when accumulating and reporting costs. What the Complaint does allege is that SCI's cost accounting system was unable to satisfy CAS due to "certain inherent errors" related to the aggregation of labor costs by product line. Compl. ¶ 35. But CAS does not require a contractor to accumulate labor costs by contract or purchase order, and SCI's product-line accumulation of costs is not evidence of non-compliance with CAS sections 401, 402, 407 or 411. *See* MTD 10–12.

Finally, although the Complaint alleges that SCI made express false certifications of compliance with CAS to the government and prime contractors, Compl. ¶ 27, 46-47, it nowhere points to any certification that was allegedly false.  *See* Compl. ¶ 27 (setting forth sample "pertinent information" from a CAS certification but failing to identify any language that allegedly was false); *id.* ¶ 32 (referencing FAR clauses related to CAS, none of which contains certification language); *id.* ¶ 165 (quoting from a CAS disclosure statement submitted to Sikorsky that merely states that SCI certifies that the practices used in estimating costs in pricing the proposal are consistent "with the cost accounting practices disclosed in the applicable Disclosure Statement" but not identifying any inconsistent practice disclosed by SCI in the Disclosure Statement).  Express false certification is "a claim that falsely certifies compliance with a particular statute, regulation or contractual terms, where compliance is a prerequisite to payment."  *United States ex rel. Hockett v. Columbia/HCA Healthcare Corp.*, 498 F. Supp. 2d 25, 64 (D.D.C. 2007) (citations omitted).  Relator has not identified any record or statement that constitutes a false certification, nor specified what about that record or statement is false or misleading.  Accordingly, his CAS claims must be dismissed.

### 2.  Relator Does Not Allege Any Plausible Claim for Violation of TINA

Relator asserts that SCI's certified cost or pricing data were not "truthful, accurate, and complete."  Opp'n 23.  But the only allegations in support of this purported TINA violation relate to the same accounting deficiencies Relator relies upon as the bases for alleged CAS noncompliance.  Relator has not alleged a plausible violation of TINA for the same reasons.

TINA requires that contractors disclose certified "cost or pricing data" to the government on certain negotiated contracts that meet the applicable threshold value.  The statute defines "cost or pricing data" as "all facts that, as of the date of agreement on the price of a contract (or the price of a contract modification) . . . a prudent buyer or seller would reasonably expect to affect

price negotiations significantly." 41 U.S.C. § 3501(a)(1). Information that is judgmental is not cost or pricing data. *Id.* To plead the elements of a TINA violation, Relator must allege "that the information at issue is 'cost or pricing data' within the meaning of TINA," "that the cost or pricing data was either not disclosed or not meaningfully disclosed to a proper government representative," and that the government detrimentally relied on the defective data. *United States ex rel. Campbell v. Lockheed Martin Corp.*, 282 F. Supp. 2d 1324, 1331–32 (M.D. Fla. 2003) (quoting *United States v. United Techs. Corp., Sikorsky Aircraft Div.*, 51 F. Supp. 2d 167, 189 (D. Conn. 1999)); *see also Wynne v. United Techs. Corp.*, 463 F.3d 1261, 1265 (Fed. Cir. 2006) ("[R]eliance on defective data is a necessary element of a TINA claim."). Other than the accounting system deficiencies, Relator does not allege any defect in SCI's cost or pricing data.

Contrary to Relator's protestations, this case is directly analogous to *United States ex rel. Williams v. Martin-Baker Aircraft Co., Ltd.*, 389 F.3d 1251 (D.C. Cir. 2004). There, the relator alleged that the defendants "violated the FCA by failing to comply with certification requirements under the Truth in Negotiations Act and the accompanying FAR . . . ." *Id.* at 1255. The court observed that the complaint seemed to allege that the defendants' "certificates of cost or pricing data were false because the company failed to use historical actual costs during negotiations with the government." *Id.* at 1257. But, the court observed, "we have found no case or regulation—nor has [the relator] pointed to any—requiring the use of such data *during negotiations*." *Id.* Instead, "the FAR and TINA only require that contractors identify and make the information available to the government." *Id.* (citing *Appeal of Hughes Aircraft Co.*, ASBCA No. 30144, 90-2 BCA ¶ 22847 (Mar. 26, 1990) (stating "that a contractor is not obligated to use cost data so long as the government has the option of analyzing the data")). Relator is attempting to do the same thing here: stating the existence of a cost accumulation requirement that is not

found in any statute or regulation.  Absent from the Complaint is any allegation that SCI did not

disclose actual historical cost data or that its actual cost data were not made available to the

contracting agency.  Nor does the Complaint allege that the agreed-upon price of any contract

was fraudulently inflated because of the cost or pricing data that were disclosed.  The only facts

alleged relate to the accounting deficiencies, which, as described above, do not state a violation

under CAS.

Relator similarly fails to allege an underlying CAS violation (and thus a TINA violation)

for Counts 5 and 6.  These Counts boil down to allegations that SCI previously purchased DCU

"kits" at a certain price but used the current, higher materials price for the kits when bidding on

contracts in subsequent years.  *See* Compl. ¶¶ 220–25.  What Relator fails to address is that CAS

411 provides five acceptable inventory costing methods, one of which is "the last-in, first out

(LIFO) method."  48 C.F.R. § 9904.411-50(b).  The Complaint does not allege which inventory

costing method SCI applied, or that SCI did not purchase kits at "then current, higher prices" for

the subsequent proposals.  Therefore, the Complaint fails to allege that the DCU kits were

defectively priced, or that SCI fraudulently inflated its material costs.  Counts 5 and 6 fail to state

a plausible claim for relief.

Relator's reliance on SCI's internal profit estimates is similarly misplaced.  First, Relator

does not allege that the internal profit estimates were "cost or pricing data" that SCI was required

to disclose.  Because such projections are judgmental, they are not "facts" that a prudent buyer or

seller would reasonably expect to affect price negotiations, in contrast to factual data like the cost

of direct labor, materials, or overhead.  Second, the contention that the internal profit percentages

must be "indicative of fraud" is unsupported by any factual allegations.[1]  Opp'n 22.  In fact, the

law is to the contrary.  *See* MTD 14.  Third, without factual support, Relator contends that the

differences between the figures found in SCI's internal "margin" and "profit" projections and the

"fee" percentages disclosed in the negotiations for various firm, fixed-price contracts

demonstrate the purported inadequacies in SCI's accounting system.  *See* Opp'n 20, 23.  This

argument reflects a basic misunderstanding of what is meant by the disclosure of "cost or pricing

data."  The FAR expressly states that "[c]ost or pricing data are *more than historical accounting*

*data*; they are all the facts that can be reasonably expected to contribute to the soundness of

estimates of future costs and to the validity of determinations of costs already incurred."  48

C.F.R. § 2.101 (emphasis added).  Cost or pricing data must include, for example, factors such as

vendor quotations, changes in production methods, data supporting projections of operation

costs, and management decisions that could have a significant bearing on costs.  *Id.*  The fact that

SCI may have performed internal profit estimates using its historical accounting data—which

under the FAR is just one subset of the data that must be disclosed to comply with TINA—does

not evidence a violation of TINA.

Moreover, the Complaint does not allege that SCI's internal profit projections are from

the same time periods, involve the same contracts, use the same quantities of product, or rely

upon all of the other same inputs and assumptions that were used by the company for the purpose

of proposing any specific pricing actions alleged in the Complaint.  Companies use profit plans

for internal budgeting and other decision-making, but those plans are not necessarily based on

---

[1] In support of this contention, Relator continues to rely on the statutory profit limitation for cost-plus-fixed-fee contracts.  Opp'n 23.  But Relator fails to address the fact that there is no allegation in the Complaint that *any contract* negotiated by SCI was awarded on a cost-plus-fixed-fee basis.  *Id.*; MTD 15.

the same assumptions used in estimating costs or submitting a pricing proposal, and their existence is not evidence of TINA noncompliance. *See Appeal of E-Sys., Inc.*, ASBCA No. 17557, 74-2 B.C.A. ¶ 10782 (Aug. 7, 1974) (profit plans used for budgeting defy classification and are not automatically cost or pricing data that must be disclosed).

The fallacy in Relator's argument is highlighted in Counts 7 and 8 of the Complaint. Relator's theory of falsity for both counts rests on the mistaken proposition that a profit percentage calculated for an order of AIUs with Boeing was not identical with the fee calculated for a second order of AIUs placed at a different date and for a different number of units. Relator alleges that differences between an internal cost-profit projection, Compl. ¶ 261 and Ex. G at 1, and the cost-profit estimated for Boeing, Compl. ¶ 264 and Ex. N, mean that SCI misrepresented the latter. Opp'n 27. But the percentages are based on completely different sales figures. The May 2016 estimates provided to Boeing in Exhibit N are based on the total sales price of $3,064,487 with a profit of $510,748; whereas the August 2015 internal proposal summary in Exhibit G—prepared nearly a year earlier—is based on potential sales of $10,108,800 over a year-long contract with a potential profit a $2,984,910. That these dollar amounts changed as quantities and other inputs varied over time is neither remarkable nor cause for suspicion. One would assume that, at different times, as different quantities were under discussion, different cost-profit projections were calculated.

### 3. The Cost and Pricing Claims Are Not Alleged with Particularity

Relator fails to plead with particularity *when* or *by whom* the alleged frauds happened. He asserts without pointing to specific examples that there are "numerous specific dates for the fraudulent conduct alleged." Opp'n 7. This assertion is simply not borne out on the face of the Complaint. Merely stating the first and last year of a nine-year span of time is not enough. In *United States ex rel. Cimino v. Int'l Bus. Machs. Corp.*, the court found that the relator did not

11

adequately plead the required particulars of time merely by alleging that false claims were presented sometime during a five-year contract period.  3 F.4th 412, 424 (D.C. Cir. 2021).

Relator also argues that the Complaint is "replete with names of individuals" and that, in any case, the perpetrator of the frauds was "*the Defendant corporations themselves*."  Opp'n 10. But, as noted above, the court in *Heath* found it was sufficient to name the corporate defendant as the actor for 9(b) purposes only because the relator there, unlike here, had alleged an institutionalized scheme to defraud the United States.  *Cf. Cimino*, 3 F.4th at 424 (finding it insufficient under 9(b) to allege the fraudulent actor as the company, IBM).  When the Complaint does identify individuals, their involvement in, and knowledge of, any alleged fraud remains unclear.  *See, e.g.*, Compl. ¶¶ 226, 228, 231 (Count 5); *see also United States ex rel. Conteh v. IKON Off. Sols., Inc.*, 27 F. Supp. 3d 80, 88 (D.D.C. 2014) ("[I]dentifying . . . employees . . . without also connecting [them] to the allegedly fraudulent submissions, is inadequate.").

Finally, the Complaint does not adequately plead the nature of the alleged fraud.  The Complaint fails to specify how the alleged deficiencies in SCI's accounting system resulted in misrepresentations or false certifications to the government or what those misrepresentations even were.  MTD 41; *see, e.g.*, Compl. ¶¶ 138–40 (Count 1).  Relator's Complaint is insufficiently particular without such details about the nature of any alleged false certifications. *See Pencheng Si v. Laogai Rsch. Found.*, 71 F. Supp. 3d 73, 94 (D.D.C. 2014).  Moreover, the problem goes beyond the failure to identify any specific false claim, record or statement; the Complaint does not allege with particularity how or why any such claim, record or statement would be false or fraudulent.

The *Williams* relator argued that the defendants' certificates of cost and pricing data were false because of the difference between the negotiated contract unit prices for the products at

issue on the one hand and the historical actual cost to manufacture those products on the other.

389 F.3d at 1258.  But the court rejected that argument, finding that the complaint "sets forth no

facts that exemplify the purportedly fraudulent scheme."  *Id*.  Relator has similarly failed to do so

here.  For example, the Complaint fails to describe any manner in which SCI violated any

particular statutory or regulatory disclosure requirement under TINA.  Even where it references

contract solicitations, proposals, or negotiations, it fails to allege dates for the certification of

cost or pricing data, the falsity in the certification, the award of the contract, the presentation of

any claims for payment, or any person who was involved in presenting or causing the

presentation of any false claim.  It is impossible to glean from the Complaint what Relator

contends is the TINA violation that gives rise to an actionable false claim.

### C.  Relator's Commercial Items Claims (Counts 9 and 14) Should Be Dismissed

Relator acknowledges that it is the government purchaser, not the prospective contractor,

which determines whether a product is "commercial" under the FAR.  *See* Opp'n 31–32.  But

Relator continues to suggest, incorrectly, that a contractor must have *actually sold* its product

commercially for it to qualify it as "commercial."  *Id*. at 30, 32; Compl. ¶¶ 324, 401.  As

explained in the MTD, that is not the case:  there are many bases for a purchasing agency to

determine that a product should be treated as "commercial" under the FAR, even if it has never

been sold to the public.  MTD 20–21.  Perhaps of most potential relevance here is the FAR's

reference to products/services "*of a type*" used outside of the Government and sold, or offered

for sale, commercially.  48 C.F.R § 2.101.  This aspect of the definition—which Relator

conspicuously omits from the Complaint and Opposition—allows contracting officers to make a

commerciality determination even if the *exact* product or service offered by the contractor has

not been sold or offered for sale commercially.

As the Department of Defense's ("DoD") explains: "The 'of a type' language in the FAR definition provides *broad latitude* to contracting officers in arriving at their [commercial item determination]." Dep't. of Defense, Guidebook for Acquiring Commercial Items, *Part A: Commercial Item Determination* 22 (2018, rev. 2019) (emphasis added). [2] The Guidebook further clarifies that this "of a type" language "does not require that the exact proposed item must be sold or offered for sale to non-Government customers." *Id.* at 21; *see also id.* at 23 (offering illustrative examples of products "of a type" sold commercially). In fact, the Defense Contract Management Agency's ("DCMA") Commercial Item Group emphasizes that "[t]here are multiple paragraphs under the FAR 2.101 commercial product and commercial service definitions setting forth various scenarios, such as modifications, that allow a product to be determined commercial *despite lack of commercial sales*."[3]

The Complaint likewise alleges no facts supporting an assertion that SCI erroneously told a contracting officer that either TOCNET or the DCUs were "sold commercially." Relator has not, as required by Rule 9(b), alleged "the time, place and content of the false misrepresentations, the fact misrepresented and what was retained or given up as a consequence of the fraud' and 'individuals allegedly involved in the fraud'" for Counts 14 and 9. *Pencheng Si*, 71 F. Supp. 3d at 85 (quoting *Williams*, 389 F.3d at 1256).

**TOCNET Commercial Item Procurements (Count 14).** Now acknowledging that an agency's contracting officer determines commerciality, Relator attempts to repackage his presentment-based Section 3729(a)(1)(A) TOCNET claim as one based upon the use of a false

---

[2] Available at https://www.acq.osd.mil/dpap/dars/pgi/docs/DoD_Guidebook_PartA_
Commercial_Item_Determination_07_10_19.pdf.
[3] DCMA, *Commercial Item Group Frequently Asked Questions*, Answer to Question #7, available at https://www.dcma.mil/Commercial-Item-Group/FAQs/ (last updated May 30, 2024) (emphasis added).

record or statement.[4]  But Relator has not alleged *any* facts to establish falsity for this theory of

liability.  Based *on one email* from DLA on October 4, 2011, *see* Compl. ¶ 395, Relator asserts

that SCI was "put on notice" that TOCNET was not a commercial item.  *Id.*  Because of this

"notice," Relator alleges that *a separate* 2007 contract with Army Redstone Command Post

Systems Integration PM—which predated the 2011 DLA email by four years—and subsequent

purchases with eight different government agencies and prime contractors were all false.  *Id.* ¶¶

397–400.  Temporal gymnastics aside, one contracting officer's commerciality determination is

not necessarily binding on others.  *See* MTD 22; *see, e.g.*, DFARS § 212.102(a)(ii)(B)(2)(ii).

Relator's failure to connect this "notice" to any false statements or false certifications (implied or

express) that informed the agencies' determinations of commerciality warrants dismissal.

     Relator also does not allege any facts, much less specific facts, regarding the nine

(including the Army Redstone contract) different TOCNET procurements referenced in the

Complaint.  *See United States v. Comstor Corp.*, 308 F. Supp. 3d 56, 89 (D.D.C. 2018).  Relator

contends that SCI misrepresented that TOCNET was "sold commercially," Compl. ¶¶ 401–402,

but the Complaint does not include any factual allegations to support that contention.  Each of

the relevant contracting officers and/or prime contractors would have separately considered

TOCNET's commerciality and, if warranted, could have reached a different determination

pursuant to the discretion provided under the FAR and DFARS.  Relator does not allege, in either

his Complaint or Opposition, what allegedly inaccurate statements were included on SCI's

---

[4] Relator's theory of FCA liability for Count 14 has never been clear to Defendants.  Within
Count 14, Relator alleges a violation of "31 U.S.C. § 3729(a)(1)(A)," which is the subsection of
the statute that deals with "presentment" of false claims.  Within that Count, Relator refers to
both "false statements" and "false and fraudulent claims."  *Compare* Compl. ¶ 391 (title) *with*
Compl. ¶ 401 (title).  In his Opposition, Relator seems now to allege FCA liability predicated on
false statements, which must be pled under 3729(a)(1)(B).  Regardless, Relator does not allege a
false claim or a false statement.

website and in its communications with government agencies and prime contractors.  Relator

does not allege when any purportedly false statements were made, who made them, or to whom

at any of the nine different agencies and/or the prime contractors they were made.  As a result,

the Complaint does not meet the particularity requirements of Rule 9(b).  *See Pencheng Si*, 71 F.

Supp. 3d at 85 (summarizing Rule 9(b) requirements).  Count 14 should be dismissed under

Rules 12(b)(6), 8(a), and 9(b).

**DCU Commercial Item Procurements (Count 9).**  Relator provides little response to

Defendants' arguments that Count 9 should be dismissed, instead referring the Court to his

response regarding Count 14.  Opp'n 33.  But the facts underlying Counts 9 and 14 are distinct,

and, for the reasons asserted in the MTD, Count 9 should be dismissed.

Again, an agency's contracting officer (or the prime contractor, as applicable) determines

commerciality.  Relator evidently has recognized the legal flaw in his theory of falsity for the

DCUs:  that "SCI certified, by implication," that the DCUs were commercial items.  Compl. ¶

297.  In the Opposition, Relator now attempts to turn this claim into a fraudulent inducement

claim based on an *affirmative* misrepresentation.  Opp'n 33.  For example, for the 2011 Coast

Guard DCU contract, Relator alleges that, by merely responding to the commercial items

solicitation, SCI made an "implied certification" that was "false" and "induced the Coast Guard

to award this contract to SCI."  Compl. ¶¶ 297–98.  Relator cites no case that has recognized an

"implied certification" as the basis of a fraudulent inducement under the FCA, and the Complaint

does not allege any material omission that could form the basis of such a claim.  Similarly, for

the 2016 Contract with the Coast Guard, Relator relies on "SCI's deliberate misrepresentation in

its response to the earlier 2011 Solicitation."  *Id.* ¶ 304.  But the Complaint does not allege any

specific misrepresentation by SCI to the Coast Guard.  It instead alleges that, merely by

responding to the 2011 Solicitation and entering into the contracts to sell commercial DCUs, SCI fraudulently induced the Coast Guard into awarding the contracts.

As explained at length in the MTD, the documents that Relator cites to support the alleged fraudulent inducement do not support Relator's theory. Both the 2011 Solicitation and the 2016 Justification and Approval ("J&A") show that the Coast Guard had previously (*i.e.*, at some point prior to the 2011 Solicitation) determined that the DCUs were commercial items and procured them as such. *See* MTD 24–27. And Relator does not allege *any* facts regarding the Coast Guard's initial, pre-2011 determination that the DCUs were commercial items—he does not even mention that procurement. Instead, Relator relies on vague and conclusory allegations untethered to any specific time period or relevant contract.

The same analysis applies to the J&A. The purpose of the J&A—on which Relator places heavy reliance—was *not* to support or document a commerciality determination. It described the Coast Guard's basis for bypassing normal competition procedures to award a sole source contract to SCI for the required DCUs. MTD 25–26. A statement that the agency has determined the anticipated cost to the government is "fair and reasonable" is required in all J&As. 48 C.F.R. § 6.303-2(b)(7). Relator alleges that the Coast Guard was "misled" about "[h]istorical prices paid," "[c]urrent published catalog prices," and "[d]ata other than cost and pricing data." Compl. ¶ 305. These vague and unsupported allegations are not relevant to the Coast Guard's commerciality determination and do not survive scrutiny under Rules 8 or 9(b). Relator alleges *no facts* to support that any misrepresentation by SCI was the but-for cause of the Coast Guard's decision to procure DCUs in either 2011 or 2016. *Cimino*, 3 F.4th at 420.

### D. Relator's DCU Product Substitution Claim (Count 13) Should Be Dismissed

Count 13 is neither plausible nor specific enough to meet the pleading requirements under Rules 8(a) or 9(b). Relator continues to rely upon self-serving statements he made in an

exchange of text messages two months after he started sharing information with the government, Compl. ¶¶ 4, 385. That text message exchange outlines that Bob Kloote "wanted" to provide DCUs to the Coast Guard that had previously been "bailed" to another company, but was alerted that the FAR and the Coast Guard contract required delivery of new products. Compl. ¶ 385. But the plausibility standard of Rule 8(a)(2) asks for more than a sheer possibility that a defendant has acted unlawfully. "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Iqbal*, 556 U.S. at 678 (citation omitted).

### E. Relator's GSA Fraudulent Inducement Claims (Counts 10 and 11) Should Be Dismissed

Relator concedes in his Opposition that his GSA Fraudulent Inducement Claims are based on a single email from a single employee declining a request from the General Services Administration ("GSA") for further discounts on TOCNET products. Opp'n 29–30. But Angie Toles' alleged January 16, 2015 statement that "[p]roviding GSA with a 20%–30% discount on these items does not allow us to cover all our costs" is not enough to plead a fraudulent inducement claim under Rules 8(a) and 9(b). Compl. ¶ 332. As explained in the MTD, Relator ignores the regulatory framework governing the GSA and pleads nothing about SCI's disclosures in its Commercial Sales Practice Format ("CSP"). *See* 48 C.F.R. § 8.404(d). Nor does he cite to a single regulation that governs GSA pricing, much less plead any facts alleging that SCI violated those regulations. This is fatal to his claims. *See United States ex rel. Morsell v. NortonLifeLock, Inc.*, 651 F. Supp. 3d 95 (D.D.C. 2023) ("[C]omplete and accurate disclosure of CSPs is far more than a technicality; it is the very foundation of negotiations with GSA.").

Even if Ms. Toles' January 2015 email could suffice, the data upon which Relator relies to show the falsity of her statement predates the email by two years. *See* Compl. ¶ 332; Exhibit

R (September 2013 TOCNET C Summary Table); Exhibit S (November 2013 TOCNET V Summary Table).  Rather than alleging facts regarding SCI's CSP, which is the document that GSA relies upon to ascertain the relevant data to support the alleged counteroffer, Relator bases his allegation of falsity on a nearly two-year-old *internal* calculation projection of profit data, made before SCI ever sought to include TOCNET on the Federal Supply Schedule.  *Id.* ¶¶ 325–26.  Further, Relator does not allege which TOCNET products Ms. Toles refers to in her email. *Id.* ¶ 332.  A review of SCI's counteroffer to GSA against its "confidential internal price list" makes clear that "several of [the] products" are, in fact, priced *lower* in SCI's counteroffer to GSA than in its internal price list.  *Id.*; *see* Ex. T; *compare* Ex. U.  Therefore, the detail that Relator does allege does not plausibly allege falsity under Rule 8(a), much less with the specificity required under Rule 9(b).

The D.C. Circuit cases are clear:  a fraudulent inducement claim must plead both actual and proximate causation.  *Cimino*, 3 F.4th at 420–21.  Relator admits that the federal agencies that purchased TOCNET were welcome to seek additional discounts.  Compl. ¶¶ 339–41; *see* 48 C.F.R. § 8.404(d).  It strains credulity to suggest that an allegedly false statement in an email from Ms. Toles during negotiations was the but-for cause of GSA's decision to accept the offer when it was free to negotiate additional discounts and was not guaranteed the lowest possible price.  This is particularly implausible when the Complaint conspicuously omits any details about SCI's disclosures of its CSPs to GSA.  On his failure to plead causation, Relator writes, "[t]he Complaint expressly alleges that it was *in reliance* on Ms. Toles' false statement that GSA accepted SCI's price for the TOCNET system."  Opp'n 31.  But this response mistakenly conflates materiality and causation—ignoring the D.C. Circuit's clear counsel that they are distinct elements.  *Cimino*, 3 F.4th at 419 ("[M]ateriality and causation are not the same. . . . a

19

statement could be material—that is, capable of influencing the government's decision to enter a contract—without causing the government to do so.").

**F.  Relator's SCA Claims (Counts 12, 15, and 16) Should Be Dismissed**

**Fraudulent Inducement (Count 12)**. The Opposition acknowledges that, to prevail on his SCA fraudulent inducement claim, Relator must allege facts showing both that SCI promised to pay SCA wages and fringe benefits *at the time it entered into* the alleged SCA Contracts, and that "SCI never did, and never intended to pay its employees such wages and fringe benefits." Opp'n 38.  The Complaint does not plead the required factual elements.

As explained in SCI's MTD, the email excerpts Relator relies on to establish fraudulent intent show only that some SCI employees were aware of the SCA and discussed whether it applied in different contexts; those email excerpts do not remotely (let alone plausibly) suggest an institutionalized scheme to flout the SCA.  MTD 35–36.  Implicitly acknowledging this defect, the Opposition now references a 2016 "internal investigation" allegedly determining that there was noncompliance under the SCA Contracts.  Opp'n 38 (citing Compl. ¶¶ 368-69). Setting aside that this allegation is not in the Complaint, it does not help Relator.  He alleges no facts indicating when the SCA Contracts were executed, who executed them, when the noncompliance occurred, or whether the unnamed Finance Department staff who conducted the investigation even had sufficient knowledge of the SCA to assess compliance.

Nor does an investigation conducted *after* SCI entered into the SCA Contracts demonstrate SCI's intent *at the time it entered into* them.  Mere nonperformance of a contractual commitment to comply with regulatory requirements—even "repeated unfulfilled promises— does not state a claim for [FCA] fraudulent inducement" as a matter of law.  *United States ex rel. Barko v. Halliburton Co.*, 241 F. Supp. 3d 37, 63 (D.D.C. 2017) (citing *United States ex rel.*

*Graves v. ITT Educ. Servs., Inc.,* 284 F. Supp. 2d 487, 503 (S.D. Tex. 2003), *aff'd*, 111 F. App'x 296 (5th Cir. 2004)).

The Opposition offers no reason why the Court should adopt a different rule and fails to nudge Relator's theory that SCI *never intended* to comply with the SCA from merely possible to plausible. Nor does it respond to SCI's argument that Relator has not alleged materiality with respect to the SCA fraudulent inducement claim. *See* MTD 36 (citing authorities).

**Conversion and Reverse False Claims (Counts 15 and 16).** Relator's conversion and reverse false claims Counts rest on his novel theory that any payment a contractor receives under an SCA-covered contract somehow remains "the Government's money" until the contractor pays its employees. Opp'n 34, 39–40. His theory is premised on 29 C.F.R. § 4.6(i), an SCA regulation that sets forth various enforcement options available to the government, including the option to withhold contract payments from prime contractors to pay underpaid employees.[5] *Id.* Relator's argument hinges on his mistaken belief that withholding of contractual payments is *mandatory* under the SCA; it is not. *See* 41 U.S.C. § 6705(b)(1) (amounts determined to be due to employees "*may* be withheld" (emphasis added)); *Danielsen v. Dole*, 746 F. Supp. 160, 169 (D.D.C. 1990), *aff'd*, 946 F.2d 1564 (D.C. Cir. 1991) ("[W]ithholding of contract funds [under 29 C.F.R. § 4.6(i)] is discretionary"). And the fact that the government *may* withhold funds only from *prime* contractors renders Relator's theory nonsensical, because subcontractors such as SCI (*see* Opp'n 30 n.19) are not subject to withholding. Withholding is at most "[a]n unassessed,

---

[5] 29 C.F.R. § 4.6(i) provides in relevant part that "[t]he contracting officer shall withhold or cause to be withheld from the Government prime contractor under this or any other Government contract with the prime contractor such sums as an appropriate official of the Department of Labor requests or such sums as the contracting officer decides may be necessary to pay underpaid employees employed by the contractor or subcontractor." It also authorizes other remedies, including suspension of payment, termination of the contract, and charging the contractor for costs associated with completing the work with another contractor. *Id.*

contingent penalty" and, as such, "is not an FCA 'obligation'" triggering liability under the statute. *United States ex rel. PCA Integrity Assocs., LLP v. NCO Fin. Sys., Inc.*, No. 15-750, 2020 WL 686009, at *29 (D.D.C. Feb. 11, 2020) (quoting *United States ex rel. Kasowitz Benson Torres LLP v. BASF Corp.*, 285 F. Supp. 3d 44, 53 (D.D.C. 2017), *aff'd*, 929 F.3d 721 (D.C. Cir. 2019)).

Relator appears to abandon his argument that reverse false claim liability can arise from the alleged inclusion of FAR clause 52.232-25(d) in the SCA Contracts. As the MTD explains, it cannot. MTD 37. Nor has Relator alleged specific facts to show that SCI presented claims for labor at SCA wage rates that SCI did not pay. *See id.* 36–38.

## G. Relator Has Not Plausibly Alleged Materiality

The Supreme Court has made clear that materiality requires more than evidence "that the Government would have the option to decline to pay if it knew of the defendant's noncompliance." *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 194 (2016). Relator must plead, for example, that the government "consistently refuses to pay claims . . . based on noncompliance with the particular. . . . requirement." *Id.* at 195. Relator has not done this. With respect to most counts, including Counts 1–6, Relator does not respond to Defendants' argument that he fails to plead materiality—instead addressing materiality only with respect to a few claims and merely reciting the legal conclusions of his Complaint. For example, Counts 7 and 8 allege no facts demonstrating how Defendants' alleged noncompliance with CAS and TINA would influence Boeing's decision to award SCI the contract. Relator's GSA Fraudulent Inducement Claims rely on a similarly conclusory argument for materiality: "The availability of a discount was clearly material: that is why GSA asked for it." Opp'n 31. Here and throughout the Complaint, Relator has not alleged facts showing why the alleged falsities were material to government payment decisions. Nor does he come close to pleading that the

government would have consistently refused to pay certain claims had they been aware of the alleged falsities.  Instead, he relies on conclusory statements and the same "conjecture and speculation" on which courts have based dismissal of FCA claims in the past.[6]  *See United States ex rel. Adams v. Dell Comput. Corp.*, No. 15-CV-608 (TFH), 2022 WL 20765235, at *3 (D.D.C. Mar. 29, 2022).

### H.  Relator Has Not Plausibly Alleged Scienter

Despite investigating a variety of issues for *years* while still an employee, Relator fails to name or allege facts specific to the knowledge of individual employees.  *See United States v. Sci. Applications Int'l Corp. ("SAIC II")*, 626 F.3d 1257, 1274 (D.C. Cir. 2010).  This is insufficient even at the pleading stage.  *See Conteh*, 27 F. Supp. 3d at 88–89 (citing *SAIC II* and dismissing claims because relator failed to connect the individuals referenced in the complaint "to the allegedly fraudulent submissions").  For example, with respect to the Cost and Pricing Claims, the only specific allegations of knowledge concern the surreptitiously recorded conversation with David Low, Compl. ¶ 58, which, as explained above, does not reflect falsity because CAS permits accounting for and accumulating labor costs by product line.  *See also* MTD 16–17.  Likewise, Relator's lack of factual allegations supporting scienter is particularly apparent for the DCU Cost Inflation claims in Counts 5 and 6.  Relator's recitation of the various allegedly

---

[6] In *Escobar*, the Supreme Court expressly rejected the proposition that materiality is "too fact intensive for courts to dismiss False Claims Act cases on a motion to dismiss."  *Id.* at 195 n.6. District courts have dismissed FCA complaints under Fed. R. Civ. P. 12(b)(6) and 8(a) where the complaint did not meet the rigorous materiality requirements spelled out by the Supreme Court in *Escobar. See United States ex rel. McLamore v. Winn Cos.*, No. 16-CV-1274 (TSC), 2022 WL 18024623, at *5 (D.D.C. Dec. 30, 2022) (dismissing where relator failed to allege facts showing that government would have refused payment if it were aware of the violation); *Adams*, 2022 WL 20765235, at *3 (dismissing where relator "rel[ied] on conjecture and speculation that simply do not meet the threshold to demonstrate materiality"); *United States ex rel. Scott v. Pac. Architects & Eng'rs*, Inc., No. CV 13-1844 (CKK), 2020 WL 224504, at *8 (D.D.C. Jan. 15, 2020) (dismissing where alleged "noncompliance [wa]s 'minor or insubstantial'" (quoting *Escobar*, 579 U.S. at 194)).  This Court should do the same.

affected contracts, *id.* ¶¶ 226–34, amounts to no more than "a time period, the volume of items sold and total sales value involved in the underlying alleged fraud scheme." *See Comstor*, 308 F. Supp. 3d at 89 (finding such allegations insufficient for scienter).  There are no factual allegations connecting the contracts to a knowing decision to include the kits at inflated rates.

### I. Sanmina Should Be Dismissed

Relator's Opposition does not cite to any case law or identify factual allegations in the Complaint that could justify extending liability to Sanmina.  To plead Sanmina into the case as a defendant, Relator must allege either that Sanmina was involved directly in causing false claims to be submitted to the government, or that Sanmina should be held responsible for the actions of its subsidiary under the elements for "piercing the corporate veil."  *See Hockett*, 498 F. Supp. 2d at 59–63.  Relator does neither.

Relator first argues that Sanmina caused SCI's alleged fraud by reference to a 2014 slide presentation setting SCI's target operating margins at 18%, which he says are "well above defense industry margins."  Opp'n 42.  The Complaint does not allege that SCI's target margins were aberrant for a defense contractor, and even if it did, it still would not adequately allege that Sanmina was directly involved in the alleged fraud.  At no point does the Complaint allege that profit pressure from Sanmina caused any discrete fraudulent act or the presentation of any knowingly false claim, record or statement by SCI.  Relator seems to suggest, instead, that liability can arise merely from a parent setting a subsidiary's target operating margins.  The Court should reject this expansive and novel theory of liability—proposed without any supporting legal authority—because it would impose liability on any parent company for the unremarkable act of setting profitability targets.

Relator likewise fails to allege sufficient facts to demonstrate liability under the two-part test for corporate veil-piercing announced in *Labadie Coal Co. v. Black*, 672 F.2d 92, 97 (D.C.

Cir. 1982).  The first prong of the veil-piercing test requires "such unity of interest and ownership that the separate personalities of the [subsidiary and parent] no longer exist."  *See Hockett*, 498 F. Supp. 2d at 60 (internal citations omitted).  Courts routinely reject alter-ego liability where the allegations do not go beyond detailing a "garden-variety" parent-subsidiary relationship similar to what Relator alleges here.  *See, id.* at 59–60 (merely being a parent corporation of a subsidiary that commits an FCA violation, without some degree of participation by the parent in the claims process, is not enough to support a claim against the parent).[7]

Relator does not meet the second prong of the veil-piercing test because he nowhere alleges (plausibly or otherwise) that any inequitable result would flow from excluding Sanmina as a defendant.  For the first time in his Opposition, Relator asserts that there is a "significant potential that SCI by itself will be unable to satisfy the full judgment against it in this lawsuit."  Opp'n 41.  The Court should disregard this assertion, which Relator makes without any factual support.  The Complaint alleges no facts from which the Court could find that SCI would be unable to pay a judgment, should Relator prevail.  Consequently, there is no "inequitable result" in dismissing Sanmina.

## II.    CONCLUSION

For the foregoing reasons, Relator's Complaint should be dismissed with prejudice.

---

[7] *See also Diamond Chem. Co. v. Atofina Chemicals, Inc.*, 268 F. Supp. 2d 1, 7–9 (D.D.C. 2003) (dismissing parent company despite shared executives, common marketing, and joint use of trademarks); *United States v. Universal Health Services, Inc.*, No. 1:07CV00054, 2010 WL 4323082, at *3 (W.D. Va. Oct. 31, 2010) (dismissing parent company despite parent's supervision of the subsidiary's operations and finances, use of a common billing office, and use of the same email domain).

Dated: December 6, 2024

Respectfully submitted,

SCI TECHNOLOGY, INC. and
SANMINA CORPORATION

By their attorneys,

*/s/ Emily Lyons*
Emily Lyons (D.C. Bar No. 897538)
Jonathan Diesenhaus (D.C. Bar No. 423753)
Jesse Suh (D.C. Bar No. 1619115)
HOGAN LOVELLS US LLP
555 13th Street, N.W.
Washington, D.C. 20004
(202) 637-5600
emily.lyons@hoganlovells.com
jonathan.diesenhaus@hoganlovells.com
jesse.suh@hoganlovells.com

Michael Theis (admitted *pro hac vice*)
HOGAN LOVELLS US LLP
1601 Wewatta Street, Suite 900
Denver, Colorado 80202
(303) 899-7327
michael.theis@hoganlovells.com

Kayla H. Ghantous (admitted *pro hac vice*)
HOGAN LOVELLS US LLP
125 High St., Suite 1010
Boston, MA 02110
(617) 371-1000
kayla.ghantous@hoganlovells.com

## **CERTIFICATE OF SERVICE**

I hereby certify that on December 6, 2024, a copy of the foregoing document, filed

through the Electronic Case Management system, will be sent electronically to registered

participants identified in the Notice of Electronic Filing.

*/s/ Emily Lyons*
Emily Lyons